IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL KREINER, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. JFM-10-1062 |
| | * | |
| DOLGENCORP, INC., et al., | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | ****** | |

MEMORANDUM

Plaintiff, Michael Kreiner ("Kreiner"), brings this action against defendant, Dolgencorp, Inc.[1] ("Dolgencorp" or "Dollar General"), claiming a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1) for failure to pay overtime compensation for hours worked in excess of forty hours a week. Dolgencorp avers that Kreiner is not entitled to overtime because he worked in a "bona fide executive, administrative, or professional capacity," thereby exempting Dolgencorp from the responsibility to pay Kreiner overtime. Now pending before the court are Dolgencorp's motion for summary judgment and motion to strike evidence offered in opposition to the motion for summary judgment. The issues have been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons that follow, Dolgencorp's motion for summary judgment is granted. Because I am granting the motion for summary judgment, I will deny Dolgencorp's motion to strike as moot.

---

[1] Dolgencorp, Inc. was Michael Kreiner's former employer. Though Dolgencorp, Inc. has since been converted to Dolgencorp, LLC, Dolgencorp, Inc. remains the proper defendant in this action.

## Background

Defendant Dolgencorp, Inc. ("Dolgencorp" or "Dollar General") is a retail store chain. (Def.'s Mot. Summ. J. at 2, ECF No. 26-1.) Dollar General's corporate structure has several levels of management: corporate headquarters, regional managers, district or area managers,[2] and store managers. (Def.'s Mot. Summ. J., Ex. 1, Kreiner Dep. at 56–57, ECF No. 26-3 ("Kreiner Dep.").) The district managers ("DMs") oversee several[3] stores at a time, keeping in touch with store managers through monthly visits and weekly voicemails sent to all store managers in the district. (*Id*. at 178, 183). Store managers supervise assistant store manager(s), a lead store clerk, and a group of other store clerks. (Def.'s Mot. Summ. J. at 2.)

Kreiner was employed as the store manager in a Baltimore, Maryland Dollar General store from November 2002 to December 2003. (Kreiner Dep. at 18.) Before starting as a store manager, Kreiner spent two weeks in a training store, shadowing an existing store manager to learn his new job. (*Id.* at 36–37.) After working as a store manager for some time, Kreiner underwent training for an additional week, this time in a classroom at a training center with other store managers. (*Id.* at 98–99.) The store managers learned the "seven habits" of Dollar

---

[2] During Kreiner's employment, Dollar General briefly referred to the position of District Manager as "Area Manager" and then resumed calling them District Managers. (Kreiner Dep. at 56–57.) When Kreiner began work as a store manager, his immediate supervisor was called an Area Manager, who was in turn supervised by a District Manager, who was supervised by a Regional Manager. (*Id*.) For the sake of clarity and consistency with other Dollar General case law, I will use the term "district manager" for the person immediately superior to Kreiner.
[3] The exact number of stores in Kreiner's district is a disputed (but not material) fact. Dolgencorp asserts that the average number of stores each district manager supervises is fifteen to twenty-five. (Def.'s Mot. Summ. J. at 2.) Kreiner points out that if the average is fifteen to twenty-five, some district managers may have fewer stores under their purview. (Pl.'s Opp'n Def.'s Mot. Summ. J. at 36, ECF No. 36.) For purposes of this opinion, it is not important to know the exact number of stores Kreiner's district manager supervised; it suffices to say there were several.

General, including ordering, receiving, stocking, presentation, selling, staffing, and support. (*Id.* at 217.)

When he was first hired, Kreiner made approximately $769 a week, or $40,000 per year, about twice as much as the assistant managers in his store. (*Id.* at 177.) He later received a raise, earning $792 per week, or $41,200 per year. (*Id.* at 59.) Kreiner's understanding was that he would be paid on a salary basis, would be eligible for bonuses based on store profitability, and would work approximately 48 hours a week. (*Id.* at 59, 74.) Instead, Kreiner worked approximately 60-62 hours per week at first (*id.* at 64), then worked as many as 80-82 hours a week from February 2003 to October 2003 because his store was short-staffed. (*Id.* at 66, 72.) On average, Kreiner worked approximately 70-75 hours a week over the course of his tenure at Dollar General. (*Id.* at 72–73.) According to Kreiner, 75-80% of his time was spent performing non-managerial work, including working the cash register, stocking shelves, unloading trucks, cleaning the floors, windows, and restrooms, and taking out the trash. (*Id.* at 344–45.) In addition to these manual labor duties, Kreiner testified that his most important duty was managing his store. (*Id.* at 346.)

When Kreiner took over management of the store, it was in a state of disarray because, as Kreiner described it, the store was being "operated but not managed." (*Id.* at 296–97.) The particular store he inherited was larger than any other store in the district, and, as a result, it housed overstock inventory, some of which was seven to eight years old. (*Id.* at 90.) One of Kreiner's first tasks was to organize this extra merchandise and get it into inventory, which he was able to do within four months. (*Id.* at 143.)

To ensure some degree of uniformity across stores, Dollar General provides a Standard Operating Procedures manual ("SOP"), which instructs managers on the proper response to various situations, including handling angry customers, answering the telephone, dealing with weather emergencies, and cleaning the floor. (Pl.'s Opp'n Def.'s Mot. Summ. J. at 15, ECF No. 36.) In addition, Dollar General provides a planogram, which identifies where to place most of the merchandise. (*Id*.) As store manager, Kreiner had discretion as to 30% of the store layout, including determining what to display on the endcaps when merchandise either did not arrive or sold out. (Kreiner Dep. at 126, 304.) He also made decisions as to how to utilize floor space for displays to maximize merchandise sales, even when that went against the suggestions in the SOP. (*Id*. at 305.) To ensure that the store was fully stocked with the specific merchandise his customers wanted, Kreiner monitored business trends and ordered the products his customers purchased most. (*Id.* at 84–88, 223.) Kreiner testified that it was important that he make decisions about what products his customers preferred because otherwise he was essentially "sending [his] customers three doors down to Family Dollar." (*Id.* at 87–88.) Kreiner regularly made inventory decisions that departed from the recommended ordering formula because he wanted to "keep [his] customers happy." (*Id*. at 88.) Even once Dollar General moved to an automatic stock replenishment system known as Basic Stock Replenishment ("BSR"), Kreiner continued to make discretionary adjustments. (*Id*. at 94–96.) The automated system often failed to account for various changes in inventory, so Kreiner managed the inventory to ensure the shelves were stocked with the appropriate items. (*Id*. at 96.)

In addition to ordering and displaying merchandise, Kreiner instituted policies to decrease theft or "shrink." (*Id*. at 306–08.) He trained employees to do bag checks of all customers, to alert him to suspicious activity, and to use walkie-talkies to communicate about

4

potential shoplifters. (*Id.* at 201, 204–05, 306.) In addition, Kreiner ensured the bookkeeping was accurate and the cashiers were kept accountable. (*Id.* at 225.) Finally, as store manager, Kreiner was responsible for ensuring that all merchandise was accounted for by balancing the cash registers every night. (*Id.*)

During his employment, Kreiner worked under one of three DMs: David Johnson, Mark Bruinix, and Jim Bartlett. (*Id.* at 178.) Each of the three managers visited Kreiner's store as often as once a month for a total of twenty to thirty minutes to inspect the store's condition. (*Id.* at 178–80.) In addition, Kreiner called at least one of the DMs, Johnson, approximately once a week to let him know what was going on with the store. (*Id.* at 181.) In return, Johnson left Kreiner and the other store managers in Johnson's district weekly voicemail messages. (*Id.* at 182.) The other DMs spoke with Kreiner on the phone less frequently but still left weekly voicemails for the various store managers in their districts. (*Id.* at 182–83.) In addition, there were monthly meetings of all store managers in the district, which were often held in Kreiner's store. (*Id.* at 183.) These meetings usually lasted between forty-five minutes to an hour. (*Id.* at 183.) The amount of Kreiner's discretion varied under each DM; under Johnson, Kreiner "pretty much went in that store and [Johnson] just said go at it," but under Bruinix, there was more structure. (*Id.* at 185–86.) Kreiner was required to seek approval before hiring and firing, and the DM provided the number of labor hours to be divvied up among Kreiner's employees. (*Id.* at 186–87.)

Although Kreiner could select who to interview and could check prospective employees' credentials, including a background check and drug test, his hiring selections were subject to approval by the DM. (*Id.* at 155, 187.) His recommendations were always approved. (*Id.* at 188, 354.) Once hired, employees received Dollar General's policy manual from Kreiner, who

5

went over its contents with them and ensured compliance. (*Id*. at 48.) Kreiner was proud of his selections and his training of new employees and felt that he left the store with a better staff than it had when he started. (*Id*. at 155–56.) During his tenure, Kreiner had anywhere from five to ten employees working for him. (*Id*. at 152–53.) On a daily basis, Kreiner and at least one other Dollar General employee worked together in the store. (*Id*. at 53.) As a result, Kreiner served as the safety officer, the loss prevention monitor, and the Human Resources contact for employees within the store. (*Id*. at 54.) Kreiner trained newly hired staff, (*id.* at 134), did all Human Resources paperwork, (*id.* at 118–19, 134), conducted employment evaluations, (*id.* at 225), recommended pay rate increases and promotions, (*id*. at 219, 293), scheduled safety and security meetings with his staff on a regular basis, (*id.* at 222), and counseled and disciplined employees when necessary. (*Id*. at 322–25.) It was Kreiner's job to schedule employee hours within the labor budget he was given. (*Id.* at 107, 118, 238, 293–94.) When necessary, he requested and received additional staff hours. (*Id.* at 117–18.) He also ensured that the store was open and closed on time. (*Id*. at 218–22.)

Other than paying for store repairs and other expenses paid for with petty cash, hiring and firing decisions were the only other thing for which Kreiner had to secure DM approval. (*Id*. at 189.) Kreiner did not have to call the DM before counseling an employee, disciplining an employee, or determining the employees' schedules. (*Id.* at 189–91.) While Kreiner had to secure DM approval before firing an employee, his recommendations were never denied. (*Id.* at 317–18.) According to Kreiner, the DM never interfered with his ability to run the store as he saw fit. (*Id*. at 235.) Kreiner testified that prior to his arrival and again after his departure, the store was in disarray. (*Id*. at 296–97.) After he left, the store declined and eventually went out of business. (*Id*. at 297.)

Kreiner voluntarily left Dollar General in December 2003. (*Id*. at 18.) He later filed suit against Dollar General, joining in multi-district litigation in the Northern District of Alabama, alleging violations of the Fair Labor Standards Act ("FLSA") for failure to pay overtime. On March 30, 2010, Kreiner's case was transferred to the District of Maryland. Now pending before the court are Dolgencorp's motion for summary judgment and motion to strike.

**Motion to Strike**

Dolgencorp has moved to strike Kreiner's Exhibits 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, and 14, all of which relate to a survey conducted in 2004 regarding work done in individual Dollar General stores in Oklahoma and Texas. Dolgencorp has also moved to strike Exhibits 16, 17, and 26, which are Dollar General Newsletters, two of which were published after Kreiner's employment. In addition, Dolgencorp moves to strike Kreiner's Exhibit 18, which is a January 2001 performance review of another Store Manager. Finally, Dolgencorp objects to Kreiner's Exhibits 9 and 25. Exhibit 9 is an April 2004 memo regarding truck delivery procedures then in place, and Exhibit 25 is a selection from Dollar General's Standard Operating Procedures Manual in effect from 2005–2006.

Because this evidence does not affect the court's decision as to summary judgment, Dolgencorp's motion to strike is denied as moot.

**Standard of Review**

Summary judgment is appropriate when the evidence shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if its resolution could impact the outcome in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

7

247–48 (1986).  If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See id.* at 248.  Where the material facts are undisputed, "the question of whether [an individual's] particular activities excluded [him] from the overtime benefits of the FLSA is a question of law which . . . is governed by the pertinent regulations promulgated by the Wage and Hour Administrator."  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  The court must look to all undisputed facts, with all reasonable inferences drawn in plaintiff's favor, *see Scott v. Harris*, 550 U.S. 373, 378 (2007), to determine whether particular activities exclude him from overtime benefits, but "the court must also abide by the affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

**Analysis**

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime to employees who work in excess of forty hours per week.  *See* 29 U.S.C. § 207(2).  However, employees who work in a "bona fide executive, administrative, or professional capacity" are exempt from overtime pay.  29 U.S.C. § 213(a)(1). Application of the overtime exemption is an affirmative defense on which the employer bears the burden of proof, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974), and exemptions "are to be narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

Department of Labor regulations outline the test for determining whether an employee qualifies for overtime exemption.[4] The regulations were amended in 2004, but it is undisputed that the relevant period of Kreiner's employment ended before the amendment. The court will therefore use the pre-amendment version of the regulations. The pre-amendment regulations provide a short test for determining whether an employee worked in a "bona fide executive, administrative, or professional capacity." 29 C.F.R. § 541.1. An employee is exempt if (1) he is compensated on a salaried basis at $250 per week or more; (2) his "primary duty" is management; and (3) his work involves regular direction and supervision of two or more employees. *Id*. The employer's burden is to prove every element of the executive exemption, but in doing so, the employer need not satisfy every factor of every element; rather, the court will look to the totality of the circumstances in considering the factors collectively. *See Thomas v. Speedway Superamerica, LLC*, 506 F.3d 496, 505 n.6 (6th Cir. 2007).

It is undisputed that Kreiner was paid on a salary basis (he was the only employee in the store on salary) and that he earned more than $250 per week (he earned anywhere from $769 to $792 per week). It is also undisputed that he supervised two or more employees. The question remains, however, whether management was Kreiner's primary duty.

**I.      Primary Duty**

To determine an employee's primary duty, the regulations provide that the court must consider the totality of the circumstances. While the regulations suggest that a good "rule of thumb" is that an employee's primary duty is that which occupies over 50% of the employee's

---

[4] Department of Labor regulations have the force of law, *see United States v. Nixon*, 418 U.S. 683, 695 (1974), and control unless they are arbitrary, capricious, or manifestly contrary to FLSA. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

9

time, "time alone . . . is not the sole test." 29 C.F.R. § 541.103; *see also In re Family Dollar FLSA Litig.*, 637 F.3d 508, 515 (4th Cir. 2011) ("There is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law.").

The amount of time spent on non-managerial tasks can be misleading when the employee's managerial functions are "not clearly severable" from the non-managerial functions or are performed simultaneously. *Speedway*, 506 F.3d at 504; *see also Jones v. Virginia Oil Co.*, No. 02-1631, 2003 U.S. App. LEXIS 14675, at *9 (4th Cir. July 3, 2003). Management and non-management tasks are often intertwined and overlapping. *Speedway*, 506 F.3d at 504. For this very reason, it is often the case that the person in charge of a retail store has management as his primary duty, notwithstanding the amount of time spent performing non-management duties. *See, e.g.*, *In re Family Dollar FLSA Litig.*, 637 F.3d at 512 (finding an employee exempt despite a claim that she spent 99 percent of her time doing non-managerial work); *Jones,* 2003 U.S. App. LEXIS, at *11-12 (finding an employee exempt because, even though she spent 75-80% of her time on non-managerial tasks, she was simultaneously performing management duties); *Royster v. Food Lion*, No. 94-2360, No. 97-1443, No. 97-1444, No. 94-2645, No. 95-1274, 1998 U.S. App. LEXIS 11809, at *28–29 (4th Cir. June 4, 1998) (finding assistant store managers exempt despite a claim that only 5% of their time was dedicated to management duties). Accordingly, "a number of federal courts have disregarded the time factor where the manager is in charge of a separate facility such as a convenience store or restaurant chain." *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 449 (E.D. Va. 1996) (internal quotations and alterations omitted). Thus, "where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other factors support such a

conclusion." 29 C.F.R. § 541.103; *see also Stricker v. E. Off Road Equip., Inc.*, 935 F. Supp. 650, 655 (D. Md. 1996). The other factors include: the relative importance of managerial duties as compared to other duties; the frequency with which the employee exercises discretionary powers; his relative freedom from supervision; and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103.

Though Kreiner insists that he spent between 75 and 80% of his time performing non-managerial tasks, this claim is insufficient to defeat Dolgencorp's motion for summary judgment. In *In re Family Dollar FLSA Litigation*, the Fourth Circuit found that even when the manager of a Family Dollar store was "simply standing around or stocking shelves, she remained responsible for addressing any problem that could arise and did arise in the course of the daily retail operations." *In re Family Dollar FLSA Litig.*, 637 F.3d at 517. Similarly, even as Kreiner spent 75 to 80% of his time performing non-management tasks, he simultaneously exercised managerial discretion, remained in charge of the store, and was solely responsible for reacting to any issues that arose on a daily basis. While Kreiner lists a number of non-managerial responsibilities that he performed 75-80% of the time, it is also true that, as he himself admits, he was in charge of the store 100% of the time. In fact, in Kreiner's own estimation, there was no single employee who had a greater impact on the store's overall performance. (Kreiner Dep. at 177.) Moreover, it makes little sense to conclude that the store was without management 80% of the time while Kreiner performed non-managerial tasks. *See In re Family Dollar FLSA Litig.*, 637 F.3d at 515.

Because the percentage of time Kreiner spent on non-managerial tasks is not determinative, I turn to an evaluation of the other factors indicative of primary duty.

## II. Other Factors Relevant to the Determination of Kreiner's Primary Duty

### A. Relative Importance of Managerial Duties

The determination of whether an employee's primary duty is management need not be based solely on whether the employee spends most of her time on management activities. *Speedway*, 506 F.3d at 504. Rather, an employee's primary duty is the most important duty that the employee performs. *Id*.

The Department of Labor provides the following examples of exempt managerial duties: interviewing, selecting, and training employees; directing their work; setting and adjusting rates of pay and hours of work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in status; handling complaints and grievances and disciplining when necessary; planning the work; determining the techniques to be used; apportioning work among workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked, and sold; controlling the flow and distribution of materials or merchandise and supplies; and providing for the safety of the employees and the property. 29 C.F.R. § 541.102.

As store manager, Kreiner was solely responsible for the majority of the example managerial duties. Without Kreiner there to open and close the store, set the employee schedule, recommend new hires, supervise employees, appraise productivity, order merchandise, design merchandise displays, handle complaints, provide for the safety of customers and employees, monitor sales and cash registers, and discipline or recommend termination of problem employees, the store would not have survived. Kreiner testified that before he was hired as

manager, the store was merely operated and not managed (Kreiner Dep. at 296–97), and after he left, the store declined and eventually closed. (*Id*. at 297.) While his contributions to cleaning, stocking shelves, and running the cash register — all non-managerial tasks — were certainly important to the operation of the store, Kreiner was the only person available to direct others in performing these same tasks. Indeed, Kreiner testified that management was his most important responsibility. (*Id*. at 346.) In the absence of Kreiner's management, the store would not have functioned. Therefore, no genuine issue of material fact remains as to whether Kreiner's managerial duties were more important than the non-managerial tasks he performed.

### B. Discretionary Powers[5]

An exempt employee's duties must also involve discretion and independent judgment. Discretion requires "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free of immediate direction or supervision and with respect to matters of significance." *Stricker*, 935 F. Supp. at 656. "Although the decisions . . . must be of significance, they need not be immune from review, revision, or reversal." *Id*.

While Kreiner emphasizes the existence of the SOP and the planogram and insists that implementing those policies required no discretion, those documents did not cover all potential occurrences or all areas of the store. Even on issues that were covered, Kreiner's testimony reveals that he only relied on those documents to the extent that they were useful. In departing from the planogram when merchandising the shelves and supplementing the SOP when

---

[5] The 2004 amendments eliminated this factor. *See* 29 C.F.R. § 541.700 (2004).

instituting creative solutions to minimize shrink, Kreiner demonstrated ingenuity and discretion on matters of vital importance to the store's profitability. Kreiner also exercised discretion in following business trends and deciding to depart from the merchandise ordering formula by ordering more of the items his customers preferred.

In addition to his discretionary decisions as to merchandising shelves and ordering products, Kreiner also used discretion with personnel decisions. Kreiner allocated employee hours within the labor budget he was given and requested additional time when necessary. When problems arose with employees, Kreiner decided whether to handle it with progressive counseling or make a recommendation for termination. While Kreiner could not directly hire or fire employees without DM approval, his suggestions were always approved. Having to secure approval for certain actions cannot be said to eliminate all discretion. *See Speedway*, 506 F.3d at 506–07 (citing *Murray v. Stuckey's Inc.*, 50 F.3d 564, 570 (8th Cir. 1995)).

In light of all of the discretionary decisionmaking Kreiner did on a daily basis throughout his tenure as store manager, a reasonable jury could not find that his duties involved no discretion or independent judgment.

### C. Relative Freedom from Supervision

A store manager need not have ultimate authority for all managerial decisions in order to be exempt under FLSA. *Murray v. Stuckey's*, 939 F.2d 614, 620 (8th Cir. 1991). If exemption required complete authority and no supervision, only the CEO of a company would be exempt. *Speedway*, 506 F.3d at 507 ("[W]e reiterate that the third factor considers only the '*relative* freedom from supervision'; it does not demand complete freedom from supervision, such that

she is answerable to no one, as this would disqualify all but the chief executive officer . . . .") (emphasis in original).

During his employment, Kreiner worked under one of three DMs. Each of the three managers visited Kreiner's store as often as once a month for a total of twenty to thirty minutes. In addition, Kreiner called at least one of the DMs, Johnson, approximately once a week to let him know what was going on with the store, but he was otherwise not in contact with his other DMs on a voluntary basis. The DMs left Kreiner and the other store managers in the district weekly voicemail messages, and there were monthly meetings of all store managers in the district, usually lasting between forty-five minutes to an hour. Other than those infrequent contacts with the DMs, Kreiner was required to secure approval for hiring and firing decisions, repair expenditures, and other petty cash expenses. He was otherwise free to manage his store as he saw fit. (Kreiner Dep. at 235.)

As Kreiner's testimony makes clear, he was without direct supervision of any kind the vast majority of the time. In *In re Family Dollar FLSA Litigation*, the Fourth Circuit concluded that a district manager's visits once every two to three weeks did not impede a finding of relative freedom from supervision. Here, Kreiner's DMs visited even less frequently, and he testified that they did not interfere with his ability to manage the store. Therefore, no genuine issues of material facts remain as to whether Kreiner was relatively free from supervision.

### D. Relationship Between Salary and Others' Wages

The final factor in determining an employee's primary duty concerns "the relationship between his salary and the wages paid other employees for the kind of nonexempt work

15

performed by the supervisor." 29 C.F.R. § 541.103.  When an allegedly exempt employee makes more money than non-exempt employees, this factor favors exemption.

Kreiner argues that his earnings should be calculated by dividing his salary by the number of hours he typically worked.  (Pl.'s Opp'n Def.'s Mot. Summ. J. at 20 (citing *Plaunt v. Dolgencorp, Inc.*, No. 3:09cv079, No. 1:09cv084, 2010 U.S. Dist. LEXIS 132135 (M.D. Pa. Feb. 3, 2011).)  Dolgencorp, on the other hand, suggests that weekly salary is the relevant comparison.  (Def.'s Mot. Summ. J. at 33 (citing *Speedway*, 506 F.3d at 509).)  The regulations provide that the allegedly exempt employee's "salary" is to be compared to the wages of the other employees, suggesting that the court should not convert that salary into an hourly wage; however, it is also true that there is no consensus in the courts as to which method of calculation and comparison to use.

By either calculation, Kreiner made more than the other employees.  According to Dolgencorp's preferred method of comparison, Kreiner made between $769 and $792 per week, nearly 283% more than the full-time equivalent of the hourly sales clerks, who earned between $5.35 and $7 an hour.  (Def.'s Mot. Summ. J. at 33; Def.'s Reply Supp. Mot. Summ. J. at 13.)  By Kreiner's calculations, his hourly rate was between $10.25 and $11.31, compared to $8.65 an hour for the next highest paid hourly employee.  (Pl.'s Opp'n Def.'s Mot. Summ. J. at 22.)  Even by Kreiner's preferred method of comparison and taking his $8.65 to be the correct hourly rate for the store employees rather than the $5.35 to $7 that Dolgencorp suggests, Kreiner was making between 18% and 30% more than the next highest paid employee.  The *Speedway* court found a 30% difference to be "significant."  Speedway, 506 F.3d at 509.  Kreiner was also eligible for bonuses of as much as three times the amount assistant store managers could receive (Def.'s Mot. Summ. J. at 4); regular hourly employees were not eligible for bonuses at all.  The

16

store was a "profit center," and its profitability was directly tied to Kreiner's compensation, reflecting Kreiner's greater responsibility and control over the store. *See In re Family Dollar FLSA Litig.*, 637 F.3d at 517–18. By either method of comparison, therefore, no genuine issues of material fact remain as to whether Kreiner made more money than his non-managerial employees. Thus, this factor weighs in favor of exemption.

## CONCLUSION

Having considered the factors relevant to a determination of Kreiner's primary duty, I conclude that the totality of the circumstances unequivocally indicates that Kreiner's primary duty was management. Because it is undisputed that Kreiner was compensated on a salaried basis at $250 per week or more, regularly supervised two or more employees, and the facts (as Kreiner described them) establish as a matter of law that Kreiner's primary duty was managerial, he was exempt from overtime pay. Accordingly, defendant Dolgencorp's motion for summary judgment is granted.

January 30, 2012                                         /s/
Date                                                     J. Frederick Motz
                                                         United States District Judge